**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

FEDERAL TREASURY ENTERPRISE
SOJUZPLODOIMPORT and OAO "MOSCOW
DISTILLERY CRISTALL,"

              Plaintiffs,

        -against-

SPIRITS INTERNATIONAL B.V., FORMERLY
KNOWN AS SPIRITS INTERNATIONAL N.V.;
SPI SPIRITS LIMITED; SPI GROUP S.A.; YURI
SHEFLER; ALEXEY OLIYNIK; ALLIED
DOMECQ INTERNATIONAL HOLDINGS B.V.;
ALLIED DOMECQ SPIRITS & WINES USA,
INC., d/b/a ALLIED DOMECQ SPIRITS, USA;
WILLIAM GRANT & SONS USA; and WILLIAM
GRANT & SONS, INC.,

              Defendants.

---

04 Civ. 08510 (GBD)

**THIRD AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

RECEIVED
FEB 2 2 2011
U.S.D.C. S.D. N.Y.
COMPLETED

       Plaintiffs the Russian Federal Treasury Enterprise Sojuzplodoimport ("FTE") and

OAO "Moscow Distillery Cristall" ("Cristall"), by and through their undersigned counsel Quinn

Emanuel Urquhart & Sullivan, LLP, bring this action against defendants for declaratory relief,

injunctive relief, and damages under the laws of the United States and the State of New York,

and hereby allege, on personal knowledge as to their own conduct and upon information and

belief as to the conduct of others, as follows:

## NATURE OF THE ACTION

       1.     This action arises out of defendants' unlawful misappropriation and

unauthorized commercial exploitation of STOLICHNAYA and related trademarks in the United

States in connection with the sale of vodka and other spirits. The STOLICHNAYA brand was

developed in the 1940s. Until 1992, the American trademarks for STOLICHNAYA ("the

Marks")[1] were owned, on behalf of the Soviet Union, by a state entity then-named the All-Union Foreign Economic Association Sojuzplodoimport ("VVO-SPI"). That entity registered the primary STOLICHNAYA trademark in the United States in 1969, and later, in effect, licensed that trademark and other marks derived from it to PepsiCo, Inc. ("PepsiCo").

2.     In 1992, control over the STOLICHNAYA trademarks in the United States and throughout the rest of the world was stolen from the Russian people. Shortly after the dissolution of the Soviet Union, the directors of VVO-SPI registered a private corporation with a name virtually indistinguishable from the Soviet state entity they had run, asserted that this private corporation was the entity's successor, and assumed control of the STOLICHNAYA trademarks throughout the world. Defendants Yuri Shefler ("Shefler") and Alexey Oliynik ("Oliynik") in turn obtained control over the corporation and, through a series of transactions, purported to transfer ownership of the Marks to Defendant Spirits International N.V. (now Spirits International B.V.), which they own, direct and dominate. In 2001, purporting to be VVO-SPI's successor in interest, Spirits International instructed PepsiCo to assign the Marks to Defendant Allied Domecq International Holdings, B.V. ("ADIHBV"). PepsiCo did so, thereby completing the theft of the Marks.

3.     ADIHBV used the Marks in the United States without VVO-SPI's permission. In December 2008, several months after ADIHBV purported to assign the Marks to Spirits International, Spirits International's parent, SPI Group S.A. contracted with Defendants William Grant & Sons, Inc., ("WGS Inc.") and William Grant & Sons USA ("WGS USA") to distribute vodka bearing the Marks in the United States, and WGS Inc. and WGS USA subsequently began doing so.

4.     The following diagram illustrates the unlawful transfers of the Marks:

---

[1]   The Marks include the primary STOLICHNAYA mark registered in 1969 with the United States Patent and Trademark Office and the derivative marks registered by PepsiCo, Inc. and others, which were assigned to defendant Allied Domecq International Holdings, B.V. on January 1, 2001.



In 1992, state entity VVO Sojuzplodoimport ("VVO-SPI") was directed by an insider to invest in a newly created entity, Foreign Economic Joint Stock Company Sojuzplodoimport ("VAO-SPI").

In 1993, VAO-SPI expelled VVO-SPI but took its assets, including its trademarks. VAO-SPI persuaded the Russian trademark office to register the marks to it by presenting the office with a corporate charter containing the *ipse dixit* assertion that VAO-SPI was the legal successor to VVO-SPI.

In 1996, VAO-SPI was transformed into Foreign Economic Closed Joint Stock Company Sojuzplodoimport ("VZAO-SPI").

In 1997, defendants Yuri Shefler and Alexey Oliynik gained control of VZAO-SPI and "sold" the marks for $300,000 to Closed Auction Company Sojuzplodimport (missing the letter "o" between the "d" and "i" in "Sojuzplodoimport") ("ZAO-SPI").

In 1999, Shefler and Oliynik caused ZAO-SPI to sell the rights to the marks to another company they owned, defendant Spirits International, N.V., of the Netherlands.

In 2000, SPI Group S.A. entered into an agreement under which Spirits International promised to cause the assignment of the Marks to defendant ADIHBV, and defendant SPI (the abbreviation of "Sojuzplodoimport") Spirits Limited agreed to supply STOLICHNAYA vodka to defendant ADUSA commencing in January 2001.

In January 2001, ZAO and Spirits International caused PepsiCo. to assign the Marks to ADIHBV.

On or about August 4, 2008, ADIHBV assigned the Marks to Spirits International.

On or about December 15, 2008, SPI Group S.A. contracted with defendants WGS Inc. and WGS USA to distribute vodka bearing the Marks.

5.     Upon discovering that VVO-SPI had not been privatized and that the STOLICHNAYA trademarks had been misappropriated in Russia, the United States, and the rest

of the world, the Government of the Russian Federation promptly sued to establish that VVO-SPI remained the true owner of the STOLICHNAYA trademarks.  In decisions subsequently upheld by the European Court of Human Rights, the Russian courts agreed, ruling that VVO-SPI had not been privatized and that the purported assignments of the STOLICHNAYA trademarks were null and void.  In light of the Russian courts' rulings, on October 26, 2001 the Russian Federation Committee on Patents and Trademarks ("Rospatent"), a body equivalent to the United States Patent and Trademark Office, changed the name of the owner of the trademark for STOLICHNAYA in Russia to the Russian Federation, represented by the Russian Ministry of Agriculture, and the Government of the Russian Federation in turn has entrusted FTE with the responsibility for using and disposing of the STOLICHNAYA trademarks in Russia and abroad and, where necessary, recovering title to them and obtaining compensation for their past, unauthorized use by others.

> 6.      Accordingly, FTE and Cristall, which FTE has given the exclusive right to produce STOLICHNAYA vodka for sale in the United States, seek a declaration that FTE is the rightful holder of the STOLICHNAYA trademarks in the United States; injunctive relief against further acts of misappropriation and trademark infringement in violation of the laws of the United States and the laws of New York State; cancellation of trademarks infringing the Marks; disgorgements of profits earned as a result of infringement of the Marks; recovery of damages caused by Defendants' misappropriation of the Marks, punitive damages and exemplary damages; and interest, costs, and attorneys' fees.

## JURISDICTION AND VENUE

> 7.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1338, and supplemental jurisdiction under 28 U.S.C. § 1367(a).  As to Defendants Spirits International B.V.; SPI Spirits Limited; SPI Group S.A.; ADIHBV; Allied Domecq Spirits & Wines USA, Inc., ("AD USA"); WGS, Inc.; and WGS USA, venue lies in this district under 28 U.S.C.

§ 1391(b)-(c). As to Defendants Shefler and Oliynik, venue lies in this district pursuant to 28 U.S.C. § 1391(d).

8.     Each defendant is or was, directly or indirectly, transacting business within New York State and this District involving the use of the Marks.

9.     Each defendant has, directly or indirectly, committed tortious acts within and/or without the state of New York with respect to the use and purported ownership of the Marks, and those acts have caused injury to Plaintiffs within the State.

10.    Each defendant, through its or his business transactions and other activities concerning the Marks derives or has derived substantial revenue from the sale and consumption of goods in this State and from interstate and international commerce, and through such conduct expects, or should reasonably expect, its or his acts to have consequences in this State. Defendants have directed and continue to direct tens of millions of liters of vodka bearing the Marks into the United States annually, resulting in hundreds of millions of dollars in sales. Upon information and belief, a substantial part of such sales have taken place in the State of New York.

11.    Defendants' unlawful activities from January 2001 until August 2008 were conducted pursuant to a November 15, 2000 contract for the assignment of the Marks among Defendants ADIHBV, AD USA, Spirits International, B.V. (then-named "Spirits International, N.V."), and SPI Spirits (Cyprus) Limited. This contract specifically provided that it "shall be construed in accordance with and governed by the laws of the State of New York." Thus, by signing the contract, the foregoing defendants explicitly consented to jurisdiction in the Southern District of New York. Further, the deed of assignment itself, which is attached as Exhibit C to the contract, was executed in the State of New York; reflects that the assignor PepsiCo had its principal place of business in Purchase, New York; and contains further consent to jurisdiction in the State of New York.

12.    Defendants WGS Inc. and WGS USA maintain their principal places of business in New York City in this State.

## PARTIES

13.     Plaintiff FTE is an economic entity of the Russian Federation organized and existing under the laws of Russia, with its principal place of business in Moscow, Russia. The Russian Federation has entrusted FTE with the STOLICHNAYA trademarks throughout the world, including the United States, and FTE therefore is the rightful holder of the Marks (on behalf of the Russian Federation) and has the exclusive right to use the Marks.

14.     Plaintiff Cristall is a corporation organized and existing under the laws of Russia, with its principal place of business in Moscow, Russia.  FTE has given Cristall an exclusive license to produce vodka and other products bearing the Marks for sale in the United States.

15.     Defendant Spirits International, B.V. ("Spirits International"), which was known as Spirits International N.V. when this suit commenced, is a corporation organized and existing under the laws of the Netherlands, with its principal place of business in Luxembourg. Spirits International is a subsidiary of SPI Group S.A.

16.     Defendant SPI Group S.A. is a corporation organized and existing under the laws of Switzerland, with its principal place of business in Geneva, Switzerland.  SPI Group S.A. has claimed ownership of the trademarks at issue; it has negotiated deals for licensing, and distribution of vodka bearing the Marks in New York and elsewhere in the United States; and it has sought to enforce its purported rights to the Marks by sending cease-and-desist letters to entities in the United States that it believed were infringing the Marks.

17.     Defendant SPI Spirits Limited ("SPI Spirits") is a corporation organized and existing under the laws of Cyprus, with its principal place of business in Cyprus.

18.     Spirits International, SPI Group S.A., and SPI Spirits are part of the SPI Spirits Group ("SPI Group"), a group of companies owned or controlled by defendants Shefler and Oliynik and based in Switzerland.  The SPI Group operates a wholesale and retail alcohol distribution network that owns alcohol distilleries and has business interests in agriculture, finance, and real estate.

19.     Defendant Shefler is an alien who maintains a residence in the United States.  He also has, directly or indirectly, transacted business in this District and/or committed acts of trademark infringement and/or other unlawful acts in this District with respect to the Marks.

20.     Defendant Oliynik is a non-resident alien.  Oliynik has, directly or indirectly, transacted business in this District and/or committed acts of trademark infringement and/or other unlawful acts in this District with respect to the Marks.  SPI Group S.A., SPI Spirits, Spirits International, Shefler, and Oliynik are referred to collectively as the "Shefler Defendants."

21.     Defendant ADIHBV is a corporation organized and existing under the laws of the Netherlands, with its principal place of business in Breda, Netherlands.

22.     Defendant AD USA is a corporation organized and existing under the laws of the State of Michigan, with its principal place of business in the State of Connecticut.  AD USA is licensed to do business in New York by the Alcoholic Beverage Control State Liquor Authority; it sells liquor and wine at wholesale, pursuant to a Class 203 License; and it maintains offices at 565 Taxter Road, Elmsford, New York 10523.  ADIHBV and AD USA are referred to collectively as the "Allied Domecq Defendants."

23.     Defendant WGS USA is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York City.

24.     Defendant WGS Inc. is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business in New York City.  WGS Inc. and WGS USA are referred to collectively as the "WGS Defendants."

25.     At all relevant times mentioned in this Complaint, SPI Group S.A., SPI Spirits, and Spirits International have been or are mere shells, instrumentalities, and/or conduits through which Shefler and Oliynik conduct, and have conducted, their unlawful activities.  Shefler and Oliynik own and have directly managed, controlled and/or dominated the operations of SPI Group S.A., which in turn owns, controls and/or dominates the operations of Spirits International and SPI Spirits.  Oliynik, who serves on SPI Group S.A.'s board of directors,

is also a member of SPI Spirits's board of directors, and other members of SPI Group S.A.'s board also are members of SPI Spirits's board. In connection with the Marks, SPI Spirits acts on behalf of SPI Group S.A. by supplying vodka that the WGS Defendants sell, and the Allied Domecq Defendants before them sold, in the United States pursuant to contracts negotiated by SPI Group S.A. Similarly, Spirits International holds and manages trademarks for which SPI Group S.A. negotiates deals such as SPI Group S.A.'s contracts with the WGS Defendants and the Allied Domecq Defendants for use of the Marks. Thus, SPI Group S.A., Spirits International, and SPI Spirits are not separate legal entities from Shefler and Oliynik. To avoid an inequitable result, SPI Group S.A., SPI Spirits, and Spirits International should be regarded as the alter egos of Shefler and Oliynik, and SPI Spirits and SPI International should be regarded as the alter egos, departments or agents of SPI Groups S.A.

26.     Defendants, and each of them, were acting in concert and active participation with each other in committing the wrongful acts alleged herein, and were the agents of each other and were acting within the scope and authority of that agency and with the knowledge, consent, and approval of one another.

## FACTUAL BACKGROUND

### Origin of the STOLICHNAYA Marks

27.     In Russian, the word "Stolichnaya" means "from the capital." The name connotes unsurpassed quality. For decades, STOLICHNAYA brand vodka has been owned either by the Soviet Union or by the Russian Federation, which succeeded the Soviet Union.

28.     Under Soviet law, the Soviet Union was not permitted to participate directly in civil affairs, but rather was required to participate through ministries and other state bodies. In addition, ministries and other state bodies were not permitted to participate directly in business activities. As a consequence, the Soviet Union exploited commercially valuable rights and property owned by it through state enterprises which were entrusted with such rights or property and were closely controlled by the Soviet Union. These state enterprises enjoyed many

8

attributes of ownership over the rights and property entrusted to them such as the right to possess, use, and, to a limited extent, dispose of those rights and property, but the Soviet Union retained ultimate ownership of such rights and property.

29.     The Soviet Union also limited the number of state enterprises able to engage in international commerce.  Only special enterprises were allowed to interact with foreign countries and import or export products.

30.     In or about June 1966, the Soviet Ministry of Foreign Trade established a special state enterprise named the All-Union Association Sojuzplodoimport ("V/O-SPI"), which was made responsible for importing vodka and wine, fruits, and for both importing and exporting vegetables, and other foods, including STOLICHNAYA brand vodka.

31.     In or about April 1967, V/O-SPI filed an application for the STOLICHNAYA trademark in the United States.  In or about February 1969, the STOLICHNAYA trademark was registered with the United States Patent and Trademark Office pursuant to Certificate of Registration No. 0865462.

32.     In October 1969, in connection with the Soviet Union's accession to the Paris Convention for the Protection of Industrial Property, V/O-SPI registered trademarks for a number of vodkas, including a trademark for STOLICHNAYA, with the Soviet Union's Committee for Inventions and Discoveries at the Council of Ministers.  The STOLICHNAYA mark received Registration No. 38388.

**Evgeniy Sorochkin's Unlawful Hijacking of the STOLICHNAYA Marks**

33.     In or about January 1990, the Soviet Union's State Agro-Industrial Committee lawfully reorganized V/O-SPI's successor into the All-Union Foreign Economic Association Sojuzplodoimport ("VVO-SPI").  Thereafter, VVO-SPI held the rights to the STOLICHNAYA marks both in the Soviet Union and in the United States.

34.     Shortly thereafter, the Soviet Union began to collapse, and on or about December 26, 1991, the U.S.S.R. was officially dissolved.

35.     In the political and economic chaos that accompanied the collapse of the Soviet Union, much state-owned property was misappropriated by criminals, corrupt "entrepreneurs," and others.  According to the prestigious Analytic Center of the Russian Academy of Sciences, "55 percent of capital and 80 percent of voting shares [of privatized companies] were transferred, during privatization into the hands of domestic and foreign criminal capital."

36.     Russia's privatization process is perhaps the best modern example of Honore de Balzac's statement that "[b]ehind every great wealth, there is a crime."  Upon information and belief, billion dollar enterprises were "hijacked" by their managers and/or directors for virtually nothing.  Within Russia, the privatization process has been commonly referred to as "prikh-vatizatsiya," which combines the Russian verbs meaning to "privatize" and to "grab."

37.     VVO-SPI was subject to these depredations.  Taking advantage of rapidly weakening governmental oversight and the escalating economic confusion within the country, the staff of VVO-SPI, led by its General Director, Evgeniy Filippovich Sorochkin ("Sorochkin"), conspired to make it appear that VVO-SPI (a state-controlled entity) had been lawfully transformed into a private joint stock company.  Sorochkin did so by creating a private joint stock company using a name substantially identical to VVO-SPI's name and asserting in its corporate charter that it was the successor to VVO-SPI.  In fact, however, Sorochkin did not even attempt to comply with the requirements for privatization.

38.     Sorochkin and the staff of VVO-SPI began the process of assuming private control over VVO-SPI and the STOLICHNAYA trademarks in September 1990.

39.     At that time, the Soviet Union had only rudimentary provisions concerning privatization which were part of the law governing the formation of joint-stock and limited liability companies.  Under Article 46 of the Resolution of June 19, 1990, no. 590 ("On Validation of Regulations on Joint-Stock Companies and Limited Liability Companies and on Regulation on Securities"), a state enterprise could be reorganized into a joint-stock company.

The first step in the process specified by Article 46 was a joint decision by the work collective for the state enterprise and the State body supervising the enterprise to reorganize the state enterprise into a joint-stock company. Then, among other things, the enterprise would have to be valued by a committee made up of representative of the supervising State body, the worker's collective, and the financial bodies; the purchase price for the shares set by the committee would have to be received, the debts of the enterprise be paid, and any remaining amounts paid to the State; and the enterprise would have to be registered.

40. On September 20, 1990, a joint decision was made by the worker's collective of VVO-SPI and the supervising State body, the State Commission of the U.S.S.R. Council of Ministers on food supply, to convert VVO-SPI into a joint stock company. But this joint decision was never carried out because Sorochkin and his colleagues did not satisfy any additional steps required under Soviet law.

41. For example, no valuation committee was formed, and no valuation was made.

42. The debts of VVO-SPI also were not paid, and no amounts collected in connection with the formation of VAO-SPI were paid to the State.

43. Indeed, far from attempting to transform VVO-SPI into a private corporation under Soviet law, when Sorochkin registered VAO-SPI on or about January 20, 1992, he did not include in the application any reference to the September 1990 joint decision.

44. In addition, VVO-SPI was not reorganized into VAO-SPI. To the contrary, VVO-SPI was listed as one of the founding shareholders of VAO-SPI.

45. Sorochkin and his colleagues also failed to comply with the requirements of privatization laws passed before the registration of VAO-SPI in January 1992.

46. In October and December 1990, the Russian Soviet Federated Socialist Republic ("RSFSR") assumed control over state enterprises located within RSFSR territory and passed legislation requiring approval of the RSFSR State Property Committee for the privatization of any state enterprises. VVO-SPI did not ask for the RSFSR State Property

11

Committee's approval for the privatization of VVO-SPI, and the Committee never gave such approval.

47.     On July 3, 1991, the RSFSR enacted a statute "On Privatization of Government and Municipal Enterprises in the RSFSR."  In addition to approval by the RSFSR State Property Committee, this statute required parties seeking to privatize state enterprises to form a privatization committee, which would draw up a privatization plan detailing the method of privatization, the capital, the purchase price and the payment method, as well as approval of that plan by the Soviet Council of Peoples' deputies.  Sorochkin did not comply with any of these requirements.

48.     Although Sorochkin did not comply with the requirements of any privatization legislation, when VAO-SPI was formed he included a provision in VAO-SPI's charter asserting that "VAO Sojuzplodoimport is the legal successor of VVO Sojuzplodoimport."  Based upon this charter, he caused VAO-SPI to be registered with the Moscow Registration Chamber as VVO-SPI's successor.

49.     Upon information and belief, Sorochkin also appointed himself Chairman of the Board of Directors of VAO-SPI, even though he had never relinquished his position as General Director of VVO-SPI.

50.     On June 3, 1993, after its physical, monetary and other assets (including the STOLICHNAYA trademarks throughout the world) had been simply taken or usurped by VAO-SPI , VVO-SPI was "expelled" from VAO-SPI by resolution of a general meeting of VAO-SPI's shareholders, and VVO-SPI's shares were given to TOO Implod, a company wholly owned by Sorochkin and other former VVO-SPI officials.  Thereafter, VAO-SPI claimed ownership of the STOLICHNAYA trademarks owned by VVO-SPI.  The Russian government received nothing in exchange for the trademarks taken by VAO-SPI.

51.     Shortly thereafter, in or about September 1993, VAO-SPI's register of shareholders reflected the expulsion of VVO-SPI from the register of shareholders and TOO Implod's new ownership interest in VAO-SPI.

52.     As a result, Sorochkin, while serving as the chief officer of both VVO-SPI and VAO-SPI, was able to coordinate the theft of the state-owned assets of VVO-SPI, including its STOLICHNAYA trademarks throughout the world, by VAO-SPI.

53.     In or about October 1992, in connection with litigation in the United States over the Marks, Sorochkin asked Rospatent, the Russian patent and trademark agency, for a letter attesting to VAO-SPI's right to the Marks.  In support of this request, Sorochkin provided Rospatent with VAO-SPI's charter.  Based upon the false statement in the charter that VAO-SPI was VVO-SPI's successor, Rospatent declared that foreign registrations for the STOLICHNAYA marks belonged to VAO-SPI as the "full and rightful successor to VVO Sojuzplodoimport."

54.     Later, based upon the false statement in VAO-SPI's charter that it was VVO-SPI's successor, Rospatent registered VAO-SPI as the holder of the STOLICHNAYA trademarks in Russia.

55.     The fraudulent nature of VVO-SPI's purported transformation into VAO-SPI is perhaps best reflected by VVO-SPI's balance sheets.  VAO-SPI's initial balance sheet, prepared in 1992, simply reflected all of VVO-SPI's assets *and* liabilities from the end of the prior fiscal year.  VAO-SPI relied on that initial balance sheet (reflecting that it had assumed VVO-SPI's liabilities) in getting its corporate charter approved and the STOLICHNAYA trademarks in Russia registered in its name.

56.     Yet, VAO-SPI's July 1993 balance sheet (reflecting the assets and liabilities of VAO-SPI as of the beginning of 1993 and the end of June 1993) eliminated all reference to VVO-SPI's assets and liabilities, thereby revealing that VAO-SPI did not truly view itself as the successor to VVO-SPI.  Thus, by 1993, as a practical matter, VAO-SPI had assumed control of VVO-SPI's assets, including the STOLICHNAYA Marks, while declining to accept VVO-SPI's liabilities.

57.     While asserting to Rospatent and foreign companies such as PepsiCo that it owned the STOLICHNAYA trademarks, VAO-SPI was careful to avoid the notice of the

Russian government and its tax organs.  Thus, VAO-SPI's balance sheets for the fiscal years 1992 and 1993 did not list these trademarks as among VAO-SPI's assets.

**Yuri Shefler Supplants Sorochkin and Takes Control of the STOLICHNAYA Trademarks**

58.    By April 1996, VAO-SPI had been renamed Foreign Economic Closed Joint-Stock Company Sojuzplodoimport ("VZAO-SPI").  Sorochkin continued to perform the executive functions of VZAO-SPI until April 1997.

59.    In April 1997, Shefler became President of VZAO-SPI and was also elected as Chairman of the Board of Directors of VZAO-SPI.

60.    Born as Yury Urasov in October 1967, Shefler has used at least three names.  By the late 1980s he was known as Yury Shabalin and, in 1994, he changed his name yet again, to Yuri Shefler.

61.    Shefler took control of VZAO-SPI under suspicious circumstances.  For example, on or about March 26, 1997, Vladimir A. Yamnikov, the General Director of Cristall, one of the largest vodka distilleries in Russia and one of the major shareholders in VAO-SPI, who was first a business associate and then an opponent of Shefler, died under suspicious circumstances of internal bleeding.  Yamnikov's family members claim that Yamnikov was poisoned by Shefler.  Prior to Mr. Yamnikov's death, on or about December 12, 1996, another prominent businessman, Cristall's Deputy General Director, A. A. Zhelko, also died under suspicious circumstances of internal bleeding.  Another Cristall Deputy General Director, Igor Tatarchenko, also was poisoned, but survived.

62.    Another adversary of Shefler died under suspicious circumstances: on the night of August 8-9, 2002, Jacob Tilipman, a Russian vodka entrepreneur and a shareholder in VZAO-SPI, was murdered shortly after filing a lawsuit contesting the transfer of the STOLICHNAYA trademarks from VZAO-SPI to ZAO-SPI.  In 2002, Shelfler threatened to murder Vladimir Loginov, then the newly appointed General Director of FTE, leading to criminal charges that have since been dropped.  Shefler is currently wanted by Interpol based upon pending charges in Russia for smuggling and illegal use of trademarks.

**The Transfers from VZAO-SPI to Spirits International**

63.     After Shefler obtained control over VZAO-SPI, Shefler, his long-time associate Oliynik, and their agents, who by then had been appointed to key positions within that company, began exploiting the trademarks held by VZAO-SPI.

64.     In October 1997, two entities headed by persons acting under the direction and control of Shefler and Oliynik—Intercatrin Group Corp. ("Intercatrin"), a mere shell Delaware corporation which no longer exists, and ZAO Eleri ("Eleri"), a Russian corporation— incorporated a joint venture named Closed Auction Company Sojuzplodimport" (missing the letter "o" between the "d" and the "i" in "Sojuzplodoimport") ("ZAO-SPI").

65.     Eleri, which was also a shareholder of VZAO-SPI, held 98 percent of the shares of ZAO-SPI; Intercatrin held the remaining 2 percent.

66.     Eleri was incorporated in Russia utilizing the lost passport of an alcoholic woman, Elena Kocherizkina ("Kocherizkina").  Detectives from the Ministry of Internal Affairs and the Moscow Prosecutor's Office conducted an investigation of her subsequent disappearance but never located either her or her body.  According to Eleri's corporate records, on or about May 14, 1996, Kocherizkina allegedly founded Eleri with 7,590,000 rubles in starting capital. However, in July 5, 1996, less than two months later, she allegedly resigned, without receiving any compensation, and simultaneously transferred her ownership interest in the company, also without any compensation.  She thus forfeited all capital she had purportedly invested.

67.     Intercatrin was a shell corporation founded solely to promote Shefler's and Oliynik's fraudulent scheme to gain control over the Marks and move them overseas.  Intercatrin no longer exists.

68.     Sorochkin, while still President of VZAO-SPI, refused to consent to the sale of the STOLICHNAYA trademarks to VZAO-SPI.  In response, Shefler and Oliynik had Sorochkin discharged from his position with VZAO-SPI.

69.     On or about December 26, 1997, only two months after its incorporation, ZAO-SPI purported to purchase the worldwide rights to the trademarks for STOLICHNAYA,

including the Marks, from VZAO-SPI, ostensibly for a mere 1.7 million rubles, which was then

the equivalent of approximately $300,000. The worldwide rights to the STOLICHNAYA

trademarks, alone, were then worth a minimum of $400,000,000.

70. Prior to December 1997, Mr. Shefler reviewed all of VZAO-SPI's

financial records, including VVO-SPI's and VAO-SPI's financial records. The financial records

he reviewed included VVO-SPI's January 1992 balance sheet, and VAO-SPI's balance sheets

from January 1993 and July 1993, all of which demonstrated that VAO-SPI did not succeed to

VVO-SPI's intellectual property assets, including the STOLICHNAYA trademarks. In addition,

if, as he should have, Mr. Shefler had looked for evidence that the steps needed to privatize

VVO-SPI had been taken, such as approval by the Ministry of State Property and payment to the

Russian Federation, he would have found that evidence lacking.

71. Prior to December 1997, Mr. Sorochkin also personally advised

Mr. Shefler that there were legal defects with VAO-SPI's chain of title to VVO-SPI's assets,

including the STOLICHNAYA trademarks.

72. Shefler's and Oliynik's December 26, 1997 "purchase" was actually a

Christmas present to themselves. At the time of the transaction, Shefler served as the Chief

Expert and Chairman of the Board of Directors of VZAO-SPI, while Oliynik served as VZAO-

SPI's Vice President and the Secretary of the Board of Directors. Shefler and Oliynik also held

indirect control over ZAO-SPI at the time of the "purchase," through their influence over

Evgeniy Shubin ("Shubin"), ZAO-SPI's General Director from October 15, 1997, to May 28,

1998. Shubin is Shefler's brother-in-law. Subsequently, ZAO-SPI was formally acknowledged

by the Shefler/SPI defendants as being part of the "SPI Group."

73. At the time of VZAO-SPI's purported purchase, Shefler and Oliynik also

exercised control over Vladimir Andreenkov ("Andreenkov"), the General Director of Eleri,

ZAO-SPI's controlling shareholder. To illustrate, just a few months before the "purchase,"

Oliynik ceded his position as the General Director of Eleri to Andreenkov on August 1, 1997.

16

Thereafter, on or about May 28, 1998, Andreenkov nominated Oliynik as the new General Director of ZAO-SPI.

74.     After transferring the STOLICHNAYA trademarks from VZAO-SPI to ZAO-SPI, Shefler and Oliynik orchestrated a series of corporate transformations of VZAO-SPI. In or about March 1998, VZAO-SPI was reorganized into the Foreign Economic Open Joint-Stock Company Sojuzplodoimport ("VOAO-SPI"). In or about December 1999, VOAO-SPI was further reorganized into the Open Joint-Stock Company Plodovaya Kompania ("OAO Plodovaya Kompania").

75.     Through these corporate transformations, Shefler and Oliynik gutted VZAO-SPI. For example, on October 17, 1997, VZAO-SPI employed 137 persons. By August 2, 1999, most of these employees had moved to ZAO-SPI, and VZAO-SPI employed just 14 persons.

76.     In the late 1990s, Shefler and Oliynik also began to shift the purported worldwide rights to the STOLICHNAYA trademarks to a company outside Russia. In or about April 12, 1999, ZAO-SPI purported to sell its alleged worldwide rights to the STOLICHNAYA trademarks to Spirits International for $800,000. The worldwide rights to the STOLICHNAYA trademarks, alone, were then worth a minimum of $400,000,000.

77.     As set forth above, VZAO-SPI was controlled by Shefler and Oliynik when the STOLICHNAYA trademarks were transferred to ZAO-SPI, and ZAO-SPI was an affiliate of the SPI Group, as SPI Group's web site acknowledges,  Therefore, when VZAO-SPI sold its alleged rights in the STOLICHNAYA trademarks to ZAO-SPI, and from ZAO-SPI to Spirits International, Shefler and Oliynik were engaged in related-party transactions and were effectively transferring the marks between their own entities.

78.     The Government of the Russian Federation, the successor to the Soviet Union and therefore and the true owner of the STOLICHNAYA trademarks, never received any part of the (far below market value) $300,000 that ZAO-SPI purportedly paid VZAO-SPI on December 26, 1997 for the STOLICHNAYA trademarks.  The transfer from VZAO-SPI to ZAO-

SPI was the first time that money changed hands in connection with the purported transfer of the STOLICHNAYA trademarks.

79.     Shefler has since claimed that the Russian Federation received consideration when VZAO-SPI assumed a debt owed by VVO-SPI.  In fact, what occurred was that VVO-SPI had been left without assets by VAO-SPI, and creditors of VVO-SPI brought claims against VAO-SPI, which by that time had been renamed VZAO-SPI.  Under Shefler's direction, VZAO-SPI resisted paying the debts, arguing that VAO-SPI was never responsible for them.  Russian and Latvian courts unsurprisingly concluded that, because VZAO-SPI held itself out as a legal successor to VVO-SPI, it was liable for the debts and ordered VZAO-SPI to satisfy the debts.

80.     When ZAO-SPI purported to sell its alleged rights in the STOLICHNAYA trademarks to Spirits International on April 12, 1999, Shefler and Oliynik once again transferred the trademarks between their own entities, and the Russian government once again received no part of the $800,000 that Spirits International purportedly paid ZAO-SPI for the trademarks.

81.     In summary, Shefler and Oliynik (as Chairman of the Board and Vice President, respectively) controlled VZAO-SPI when the marks were transferred to ZAO-SPI on December 26, 1997.  While the marks were held by ZAO-SPI, Shefler and Oliynik maintained firm control over that entity – first, indirectly, via Shubin and Andreenkov; then, directly, via Oliynik's position as General Director of that entity.  Finally, Shefler and Oliynik controlled Spirits International when the marks were transferred to it on or about April 12, 1999, in that Shefler was its founder and controlling shareholder.

**Purported Transfers of the STOLICHNAYA Trademarks**

| On Dec. 26, 1997 | On April 12, 1999 | |
| VZAO | ZAO | Sprits International |
|---|---|---|
| Shefler (Chairman of the Board; Chief Expert) | Shubin (General Director and Shefler's brother-in-law) | Shefler (founder and controlling shareholder) |
| Oliynik (Secretary of the Board; Vice President) | Oliynik (General Director) | |

**The PepsiCo Agreement and the STOLICHNAYA Trademarks in the United States**

82.     In or about March 1969, V/O-SPI assigned all rights in the STOLICHNAYA trademark in the United States to Kraus Bros. & Co. ("Kraus") and designated Monsieur Henri Wines, Ltd. ("MHW"), a Kraus subsidiary, as the authorized importer into the United States of vodka bearing the STOLICHNAYA trademark.  In addition, MHW was designated as V/O-SPI's representative for the U.S. trademark application.

83.     In 1973, V/O-SPI entered into an agreement with PepsiCo regarding the importation of Russian vodka in the United States.  Pursuant to that agreement, PepsiCo exported its PEPSI-COLA brand syrup to the Soviet Union and, in return, received the right to import STOLICHNAYA vodka (and other related vodkas) into the United States.  At or about that time, PepsiCo acquired Kraus so that it could use the STOLICHNAYA trademark in the United States, and Kraus assigned the STOLICHNAYA trademark in the United States to PepsiCo.

84.     In 1983, PepsiCo assigned to V/O-SPI the STOLICHNAYA trademark in the United States, as well as its pending application for the registration of a related mark.  In 1991, PepsiCo assigned to V/O-SPI's successor, VVO-SPI, these trademarks and several other trademarks derived from the original STOLICHNAYA trademark.

85.     In or about June 1991, VVO-SPI entered into another agreement with PepsiCo concerning the STOLICHNAYA trademarks in the United States as well as several other trademarks for Russian vodka.  Although the agreement purported to assign to PepsiCo the original STOLICHNAYA trademark and derivative trademarks, PepsiCo was in fact a mere licensee of these trademarks.  The agreement prohibited PepsiCo from sub-licensing to third parties other than its authorized importer.  In addition, it required PepsiCo to return the trademarks in the same condition as they were assigned upon expiration of a related contract and upon written request from the Government of the Soviet Union.

86.     While PepsiCo's agreements with VVO-SPI and V/O-SPI were in effect, PepsiCo heavily marketed and invested in the STOLICHNAYA brand.  Due in part to PepsiCo's

marketing efforts and investment, STOLICHNAYA vodka came to be considered a premium
vodka in New York and the United States as a whole.

87.     While PepsiCo's agreements with VVO-SPI and V/O-SPI were in effect,
the Marks—the original STOLICHNAYA trademark and the derivative marks registered to
PepsiCo—became famous and acquired secondary meaning within New York and the United
States, as illustrated by advertising expenditures, unsolicited media coverage of the product,
attempts to plagiarize the marks, and the length and exclusivity of the marks' use.  For example,
upon information and belief, PepsiCo spent millions of dollars advertising the Marks in New
York and the United States.  A search of Westlaw's "usnews" database for articles referring to
STOLICHNAYA or related marks prior to January 1, 2001, yields more than 2,000 hits.

88.     The immense quantity of STOLICHNAYA brand vodka sold in New York
and the United States further illustrates the popularity and public recognition of the Marks in the
United States by January 1, 2001.  Upon information and belief, STOLICHNAYA brand sales
alone constituted a significant percentage of total vodka sales in the United States.

**Shefler's and Oliynik's "Hijacking" of the STOLICHNAYA Marks in the United States**

89.     Realizing the importance of the STOLICHNAYA trademarks in the
United States, Sorochkin, and later Shefler and Oliynik, represented to PepsiCo that their
respective companies were the legal successors of VVO-SPI.

90.     On or about February 1992, representing itself to PepsiCo as the successor
of VVO-SPI, VAO-SPI entered into an agreement with PepsiCo that purported to delete the
provision in the 1991 agreement between PepsiCo and VVO-SPI requiring PepsiCo to return the
STOLICHNAYA trademark and related trademarks upon request by the Soviet Government.

91.     On or about February 3, 1994, VAO-SPI entered into an agreement with
PepsiCo concerning the U.S. registrations of the STOLICHNAYA trademarks in the United
States.  A true and correct copy of that agreement, Contract No. 643\01860302\42001-04A, is
attached as Exhibit A, and is incorporated herein as though set forth at length.

20

92.     In or about February 1998, SPI Spirits, which was exporting vodka from Russia to PepsiCo bearing the Marks for sale in the United States, signed an addendum to the February 3, 1994 contract between VAO-SPI and Pepsi-Cola International, Ltd.  A true and correct copy of the Addendum to Contract No. 643\01860302\42001-04A is attached as Exhibit B, and is incorporated herein as though set forth at length.

93.     In or about November 2000, the Allied Domecq Defendants entered into Trademark Supply and Distribution Agreement ("the "ADIHBV Agreement") with Spirits International and SPI Spirits.  A true and correct copy of portions of the ADIHBV Agreement is attached as Exhibit C, and is incorporated herein as though set forth at length.

94.     Pursuant to the ADIHBV Agreement, Spirits International appointed ADIHBV as the exclusive "owner" of the Marks.  Further, pursuant to a deed of assignment, effective January 1, 2001, Spirits International caused PepsiCo to "assign" all of its U.S. rights, title and interest in the Marks to ADIHBV.  PepsiCo was paid only $10 for this purported "assignment," whereas ADIHBV paid Spirits International $50 million for directing PepsiCo to assign the Marks to ADIHBV.  The reassigned trademarks listed in the deed of assignment included the following:

| Mark | Registration No. |
| --- | --- |
| STOLICHNAYA | 865,462 |
| STOLICHNAYA | 1,291,454 |
| STOLICHNAYA | 2,317,475 |
| STOLI | 1,244,735 |
| STOLICHNAYA RUSSIAN VODKA | 1,852,552 |
| STOLICHNAYA KAFYA | 2,155,523 |
| STOLICHNAYA LIMONNAYA VODKA | 2,334,080 |
| STOLICHNAYA LIMONNAYA | 2,339,463 |
| STOLICHNAYA LIMONNAYA VODKA | 2,334,079 |
| STOLICHNAYA OHRANJ | 2,291,831 |
| STOLICHNAYA OHRANJ | 2,233,190 |
| STOLICHNAYA OHRANJ | 1,988,911 |
| STOLI PERSIK | 2,189,745 |
| STOLICHNAYA STOLI PERSIK | 2,339,689 |

| Mark | Registration No. |
|---|---|
| STOLICHNAYA STOLI RAZBERI | 2,204,355 |
| STOLI RAZBERI | 2,175,465 |
| STOLICHNAYA STRASBERI | 2,202,991 |
| STOLI STRASBERI | 2,205,863 |
| STOLI VANIL | 2,192,600 |
| STOLI ZINAMON | 2,192,681 |
| STOLICHNAYA GOLD (application) | 75/184,282 |
| STOLICHNAYA STOLI KAFIYA | 2,509,871 |
| STOLICHNAYA ZINAMON | 2,509,874 |
| STOLICHNAYA STOLI ZINAMON | 2,509,873 |
| STOLICHNAYA VANIL | 2,587,139 |
| STOLICHNAYA STOLI VANIL | 2,898,451 |
| STOLICHNAYA STOLI STRASBERI | 2,552,858 |
| STOLI KAFYA | 2,509,872 |

95.     Notwithstanding language in the ADIHBV Agreement stating that ADIHBV was the "exclusive" owner of the Marks, ADIHBV was not permitted to sell the rights in those trademarks or assign them to entities other than affiliates.  Further, pursuant to that agreement, ADIHBV was not permitted to keep the goodwill attributable to the Marks.  And, at the conclusion of the ADIHBV Agreement, ADIHBV was required to reconvey all its rights, title, and interest in the Marks to Spirits International.  In fact, in an August 6, 2004 letter to a U.S. company, defendant SPI Group S.A. held itself and its subsidiary, Spirits International, out as the true owners of the Marks.  A true and correct copy of that letter is attached as Exhibit D, and is incorporated herein as though set forth at length.  Accordingly, ADIHBV was, in effect, a licensee of the Marks, and Spirits International or SPI Group S.A. was, in effect, the licensor.

96.     When the ADIHBV Agreement was signed, both the Allied Domecq Defendants and the Shefler Defendants were aware that Spirits International did not have good title to the Marks.

97.     In fact, on December 11, 2000, just 11 days before ADIHBV's acceptance of the assignment of the Marks pursuant to the ADIHBV Agreement (by assignment from PepsiCo), a Russian court issued a final judgment adverse to Spirits International's chain of title

to the Marks holding that VAO-SPI was not a legal successor to VVO-SPI. The Allied Domecq Defendants were well aware of this Russian judgment when ADIHBV accepted the assignment of the Marks on January 1, 2001.

98.    The ADIHBV Agreement was intentionally structured so that ADIHBV paid very little for the actual "assignment" of the Marks. ADIHBV wanted to minimize its financial exposure from a potential future lawsuit by the Russian Federation, and thus negotiated to make royalty payments to Spirits International instead of paying a substantial fee up front for the "assignment" of the Marks.

99.    Further, all parties to the ADIHBV Agreement were aware that the Russian Federation would eventually seek to recover its Marks. For example, Paragraph 26 of the ADIHBV Agreement was specifically negotiated to provide for such an eventuality, setting forth the parties' obligations "[i]n the event that . . . the government of the Russian Federation" or "any agency or instrumentality of the government of the Russian Federation . . . institutes a suit . . . against AD and/or Spirits alleging AD's title to Trademarks or SPI NV's reversionary interest in the Trademarks is for any reason invalid . . . ."

100.    Likewise, the Registration Statement and the Annual Reports of Allied Domecq PLC (the parent company of AD USA), filed with the United States Securities and Exchange Commission ("Form/s 20-F"), disclosed that "SPI Spirits and the Russian government are currently involved in a dispute over the trademark rights to STOLICHNAYA," and that "there is a risk" that the Russian government could take action that would prevent the Shefler Defendants from fulfilling their contractual obligations.

**ADIHBV's Use of the Marks**

101.    Pursuant to the ADIHBV Agreement, the Allied Domecq Defendants imported, advertised, distributed, and sold substantial quantities of vodka bearing the Marks in New York and elsewhere in the United States without permission from VVO-SPI, FTE, or the Russian Federation.

102.    Under the ADIHBV Agreement, the Allied Domecq Defendants bought all vodka they sold bearing the Marks from SPI Spirits.

103.    ADIHBV registered or sought to register other trademarks similar to or belonging to the same families as the Marks, to which Spirits International retained reversionary rights.

104.    One of the Marks fraudulently obtained by Allied Domecq from PepsiCo was "STOLICHNAYA RUSSIAN VODKA," Registration No. 1,852,552.

105.    Following the commencement of this litigation, ADIHBV sought to register or did register a number of other marks incorporating variations of the terms "STOLICHNAYA" or "STOLI" and "RUSSIAN." Those marks included: BEST CHILLED STOLI GENUINE RUSSIAN VODKA, Serial No. 7,8506,588; STOLICHNAYA STOLI BLUEBERI BLUEBERRY FLAVORED RUSSIAN VODKA, Serial No. 78,712,452; STOLICHNAYA STOLI BLUEBERI BLUEBERRY FLAVORED RUSSIAN VODKA, Serial No. 78,758,074; STOLICHNAYA STOLI CRANBERI CRANBERRY FLAVORED RUSSIAN VODKA, Serial No. 78,758,082; and STOLICHNAYA STOLI CRANBERI CRANBERRY FLAVORED RUSSIAN VODKA, Serial No. 78,758,089 (emphasis added).

**The Shefler Defendants' Use of the Marks**

106.    On or about August 4, 2008, ADIHBV assigned the Marks to Spirits International.

107.    After that assignment, the Shefler Defendants imported, advertised, distributed, and/or sold substantial quantities of vodka bearing the Marks without permission from FTE or the Russian Federation.

108.    Since ADIHBV reassigned the Marks to Spirits International, B.V. on or about August 4, 2008, Spirits International has registered or applied to register the following marks: STOLICHNAYA STOLI WILD CHERRI and design, Serial No. 85,068,226; FROM THE HOUSE OF STOLICHNAYA, Serial No. 85,031,409; STOLICHNAYA STOLICHNAYA and design, Serial No. 79,085,598; STOLI PEACHIK, Registration No. 3,526,585; STOLI

GALA APPLIK, Registration No. 3,861,810; STOLICHNAYA STOLI POMEGRANIK POMEGRANATE FLAVORED RUSSIAN VODKA SPI word and design mark, Serial No. 77,719,236; and STOLICHNAYA STOLI WHITE POMEGRANIK word and design mark, Serial No. 77,899,772.

**WGS Inc. and WGS USA's Use of the STOLICHNAYA Marks**

109.   On or about December 15, 2008, Spirits International's parent SPI Group S.A. entered into an agreement with WGS Inc. and WGS USA for the latter to distribute vodka bearing the Marks in the United States, which WGS Inc. and WGS USA began to do.

110.   Under their agreement with SPI Group S.A., the WGS Defendants buy from SPI Spirits all vodka sold by them bearing the Marks.

111.   Brands currently marketed in the United States by WGS USA include without limitation STOLICHNAYA, STOLI RED, STOLI WILD CHERRI, STOLI WHITE POMEGRANIK, STOLI GALA APPLIK, STOLI OHRANJ, STOLI RAZBERI, STOLI VANIL, STOLI BLUBERI, STOLI PEACHIK, STOLI STRASBERI, STOLI BLAKBERI, STOLI CITROS, STOLI CRANBERI, STOLI GOLD, STOLI BLUE, and ELIT BY STOLICHNAYA.

112.   Neither FTE nor the Russian Federation has authorized WGS Inc. or WGS USA to use the Marks in any way.

**Russian Court Proceedings Resulting in Recovery of the Russian STOLICHNAYA Marks**

113.   The Russian judiciary is divided into three branches: the courts of general jurisdiction; the arbitrazh (commercial) court system; and the Constitutional Court.  The arbitrazh court system has four levels: arbitrazh courts of first instance; arbitrazh courts of appeals instance; arbitrazh courts of the cassation instance; and the Supreme Arbitrazh Court. Arbitrazh courts hear cases involving business disputes between private legal entities, and between private legal entities and state bodies.

114.   While Sorochkin was the president and chairman of VAO-SPI, the company's operations did not arouse any suspicion.  Sorochkin and the staff of VAO-SPI were the same individuals that had operated VVO-SPI and they operated out of the same office.  As a

consequence, the only apparent difference between VAO-SPI and VVO-SPI was a letter in the name.

115.    In 1998, the Russian Ministry of Internal Affairs received accusations that ZAO was operating without the licenses needed to buy, store, and export alcohol products and began a criminal investigation of Oliynik, the General Director of ZAO-SPI.  In the course of this investigation, Ministry of Internal Affairs officials discovered documents from ZAO-SPI and VZAO-SPI suggesting that VVO had not been transformed into VAO in accordance with applicable legislation.  The Ministry of State Property and the Accounts Chamber of the Russian Federation subsequently affirmed that VAO was not the legal successor of VVO.

116.    Based upon these developments, on or about November 2000, the Deputy Prosecutor General of the Russian Federation commenced an action in the Arbitrazh Court of Moscow (First Instance) to partially invalidate the charter of OAO Plodovaya Kompania, the successor of VAO-SPI (the private corporation VAO-SPI organized by Sorochkin) on the basis that it was not the successor of VVO-SPI.

117.    In its defense, OAO Plodovaya Kompania presented falsified evidence, including two 1992 letters allegedly signed by the First Deputy Minister of the Ministry of Agriculture, Vladimir Scherbak, and another 1992 letter allegedly from the First Deputy Minister of Foreign Economic Relations, Vladimir Shibaev.  Those letters falsely stated that VAO-SPI was the legal successor to VVO-SPI and had the right to export Russian vodka to the United States.

118.    Scherbak's alleged letters did not conform to proper clerical procedure and did not have the addressee's name.  In addition, although the letters were executed on purported Ministry of Agriculture letterhead, that letterhead did not conform to the letterhead used by the Ministry of Agriculture as of the date of the letters.  After conducting an extensive investigation, the Ministry of Agriculture found that Scherbak's 1992 letters were forgeries.  Scherbak subsequently confirmed that finding, declaring that he had never signed the two letters.

119.    The letter allegedly signed by Vladimir Shibaev also was a forgery. Shibaev's alleged letter was not on file with the Records Office of the Administrative Department of the Ministry of Economic Development and Trade of Russia, as it should have been. Because Shefler and Oliynik had ordered that VAO-SPI's corporate archives be destroyed (they were purportedly damaged in a mysterious "flood," caused by a leaking pipe on an upper floor of a building guarded around the clock), the Arbitrazh Court was unable to check the authenticity of the letter by ordering production of copies from the archives. In any event, Russian law did not provide the Ministry of Foreign Economic Relations with the authority to issue opinions with respect to successions between legal entities. Thus, Shibaev's letter could not be and was not valid.

120.    On or about December 21, 2000, after reviewing all the evidence, the Arbitrazh Court of Moscow declared that Article 2, Paragraph 2 of the OAO Plodovaya Kompania charter was invalid and that OAO Plodovaya Kompania was not the legal successor to VVO-SPI. The Court held that OAO Plodovaya Kompania could not be the successor to VVO-SPI because VVO-SPI continued to exist after the formation of VAO-SPI:

> Establishment of an enterprise by entering into a foundation agreement excludes its establishment by reorganizing any other enterprise, as these are two different ways of setting up an enterprise [*i.e.*, they are mutually exclusive]. As transformation of one enterprise into another means cessation of existence for the reorganized enterprise, the fact that in the aforementioned documents on the establishment of VAO Sojuzplodoimport, VVO Sojuzplodoimport is described as one of the founders and still legally exists to date, means that the founders of VAO Sojuzplodoimport actually set up a new legal entity having nothing to do with VVO Sojuzplodoimport. Consequently, as that new legal entity [*i.e.*, VAO-SPI] was not and could not be a legal successor of VVO Sojuzplodoimport, the statement in the defendant's charter on such legal succession is unlawful.

121.    The Court then issued a judgment against OAO Plodovaya Kompania invalidating the provision in the charter asserting OAO Plodovaya Kompania to be VVO-SPI's

successor.  A true and correct copy of the ruling of the Arbitrazh Court of Moscow (First Instance) is attached as Exhibit E, and is incorporated herein as though set forth at length.

122.     Thereafter, OAO Plodovaya Kompania appealed to the Arbitrazh Court of Moscow (Appeals Instance).  In or about February 2001, without considering the merits of the appealed judgment, the Arbitrazh Court (Appeals Instance) erroneously concluded that the Deputy Prosecutor General did not have standing to bring the suit and vacated the judgment.  A true and correct copy of the ruling of the Arbitrazh Court of Moscow (Appeals Instance) is attached as Exhibit F, and is incorporated herein as though set forth at length.

123.     The Deputy Prosecutor General then requested review by the Presidium, a division of Russia's highest commercial court, the Supreme Arbitrazh Court of the Russian Federation.  On or about October 16, 2001, the Presidium of the Supreme Arbitrazh Court reversed the Arbitrazh Court of Moscow (Appeals Instance) and held that "[i]n accordance with Article 41, Part 1 of the Code of Arbitrazh Procedure of the Russian Federation, the public prosecutor is authorized to bring an action to an arbitrazh court for defending the state and public interests."

124.     The Presidium also affirmed the  lower court decision on the merits.  It concluded that "[a]s VAO Sojuzplodoimport was established as a result of foundation [as a new entity] but not transformation [of an existing entity, *i.e.*, VVO-SPI), the first instance court's conclusion on invalidity of the provision of that company's charter pursuant to which it is a legal successor of VVO Sojuzplodoimport is correct."  A true and correct copy of the ruling of the Presidium of the Supreme Arbitrazh Court is attached as Exhibit G, and is incorporated herein as though set forth at length.

125.     OAO Plodovaya Kompania challenged the Presidium's decision before the European Court of Human Rights.  OAO Plodovaya Kompania contended that the Supreme Court decision violated its right under the Convention for the Protection of Human Rights and Fundamental Freedoms to peaceful enjoyment of property, to a fair hearing, and to be free from unfair discrimination.  The Court rejected each of these contentions.  A true and correct copy of

the decision of the European Court of Human Rights is attached as Exhibit H and incorporated herein as though set forth at length.

126.    On October 26, 2001, following the Presidium of the Supreme Arbitrazh Court's ruling, Rospatent re-registered the Russian STOLICHNAYA trademark in the name of the Ministry of Agriculture of the Russian Federation.

127.    Shortly thereafter, the Russian Public Prosecutor's Office brought an action in the Arbitrazh Court of Moscow to declare the purported December 12th, 1997 assignment of 17 vodka trademarks—STOLICHNAYA; MOSKOVSKAYA; SOVIET SPARKLING; STARKA; YUBILEYNAYA; KUBANSKAYA; ZUBROVKA; RUSSKAYA; OKHOTNICHYA; PERTSOVKA; LIMONNAYA; KREPKAYA; STOLOVAYA; SIBIRSKAYA; BALTISKAYA; KRISTAL; and SPI—from VZAO-SPI to ZAO-SPI, as well as the January 12, 1998 addendum to that assignment, null and void.

128.    On January 30, 2002, the Arbitrazh Court of Moscow (First Instance) held that because VZAO-SPI was not a legal successor of VVO-SPI, it could not have assigned any of the vodka trademarks to ZAO-SPI. Consequently, the Court declared that both the assignment of the rights in the STOLICHNAYA trademarks from VZAO-SPI to ZAO-SPI, as well as the January 12, 1998 addendum thereto, were null and void. A true and correct copy of the ruling of the Arbitrazh Court of Moscow (First Instance) is attached as Exhibit I, and is incorporated herein as though set forth at length.

129.    On March 28, 2002, the January 30, 2002 award was affirmed by the Arbitrazh Court of Moscow (Appeals Instance). A true and correct copy of the ruling of the Arbitrazh Court of Moscow (Appeals Instance) is attached as Exhibit J, and is incorporated herein as though set forth at length.

130.    FTE subsequently sued Spirits International in the Netherlands seeking to establish that Spirits International was not the rightful owner of the STOLICHNAYA trademarks in the Benelux countries (Belgium, the Netherlands, and Luxembourg). On June 14, 2006, the District Court of Rotterdam issued a decision finding that Spirits International was not the

29

rightful owner of the relevant STOLICHNAYA trademarks. The Court found that Spirits International's chain of title failed because VAO-SPI was not the successor of VVO-SPI. The Court found that the steps needed to transform VVO-SPI, including payment to the Russian Federation of the proceeds from the sale of shares, had not been performed, and that VVO-SPI could not have been transformed in VAO-SPI because it continued to exist after VAO-SPI's incorporation. In addition, the Court rejected Spirits International's defense that it was a bona fide purchaser because the $800,000 it paid for the STOLICHNAYA trademarks across the world was obviously inadequate compensation for the trademarks and because, as the chairman of the board of VAO-SPI's successor, Yuri Shefler either knew or should have known that VVO-SPI had not been privatized. A true and correct copy of the District Court of Rotterdam's ruling is attached as Exhibit K, and is incorporated herein as though set forth at length.

### The Russian Government Entrusts FTE with the STOLICHNAYA Trademarks

131.     In July 2001, in light of the rulings by the Arbitrazh Court of Moscow that VVO-SPI continued to exist and that the purported transfers of VVO-SPI's trademarks were void, the Russian Ministry of Agriculture re-registered VVO-SPI in accordance with laws requiring state enterprises created in the Soviet era to be re-registered as Russian federal state unitary enterprises. The Ministry of Agriculture therefore re-registered VVO-SPI as a federal state unitary enterprise: the Federal State Unitary Enterprise Sojuzplodoimport, or "FGUP-SPI."

132.     Because FGUP-SPI had no funds or employees with the skills needed to retrieve the assets taken from it, by letter dated August 2, 2001, FGUP-SPI requested that the Russian Federation withdraw the rights and property entrusted to it, including its rights to the Marks. A true and correct copy of that letter is attached as Exhibit L, and is incorporated herein as though set forth at length. Acting through the Ministry of Agriculture and the Ministry of Property Relations, the Russian Federation invoked  its ownership rights and withdrew the rights and property entrusted to FGUP-SPI, including the Marks.

133.    Because Russian law does not permit government bodies such as the Ministry of Agriculture to conduct business activities, the Russian Federation formed another state unitary enterprise, FTE, to exploit the STOLICHNAYA trademarks on its behalf.

134.    On December 29, 2001, the Government of the Russian Federation founded plaintiff FTE and charged the Ministry of Agriculture with formulating FTE's charter.  A true and correct copy of the Government of the Russian Federation Order No. 1741 is attached as Exhibit M, and is incorporated herein as though set forth at length.

135.    On March 11, 2002, the Government of the Russian Federation issued an order approving the charter for FTE presented by the Ministry of Agriculture.  A true and correct copy of Order No. 286-r of 11th March, 2002, which includes FTE's charter, is attached as Exhibit N.

136.    FTE's charter states that it has been established for the purpose of organizing the "wholesale and retail trade in all types of strong and soft drinks" and gives FTE the authority to "us[e] in accordance with established procedure the trade marks of alcohol products and other products containing spirits."  As a consequence, FTE is now the holder of the STOLICHNAYA trademarks in Russia and many other countries, including the United States, and therefore FTE is the only entity with the right to use and dispose of the Marks, albeit with some restrictions due to the Russian Federation's ultimate ownership of both FTE and the Marks.

137.    FTE's rights over STOLICHNAYA vodka and its trademarks are closely analogous to the rights that VVO-SPI had.

138.    FTE regularly informs the Russian Agency on Regulation of the Alcohol Market, the agency now responsible for supervising it, of its activities, including its use of the STOLICHNAYA trademarks throughout the world and the filing of this suit to recover the Marks in the United States.  Before the Agency on Regulation of the Alcohol Market began supervising FTE in July 2010, FTE similarly informed the Russian Agency on State Property and, before that, the Russian Ministry of Agriculture of its activities relating to the Marks.  Neither these state

bodies nor the Government of the Russian Federation have objected to FTE's attempts to use and recover the Marks.

139.    The Russian Federation, the Agency on State Property, the Agency on Regulation of the Alcohol Markets, and the Ministry of Agriculture each approve of FTE's efforts to recover control over the Marks and have attempted to aid FTE in exercising its rights over the STOLICHNAYA trademarks.  When FTE was formed in December 2001, the STOLICHNAYA trademark in Russia was registered in the name of the Ministry of Agriculture.  To enable Rospatent to transfer registration of the STOLICHNAYA trademark in Russia from the Ministry of Agriculture to FTE, on July 4, 2002, the Government of the Russian Federation issued a decree stating that FTE had the right to use and dispose (without the right to assign) the STOLICHNAYA trademark in Russia, together with 17 other vodka trademarks.  A true and correct copy of the Decree No. 494 is attached as Exhibit O, and is incorporated herein as though set forth at length.

140.    On January 6, 2005, in response to inquiries by foreign courts, the Government of the Russian Federation issued a decree confirming FTE's right to sue in foreign courts in its own name to protect or recover the Russian's Federation's rights to trademarks for alcoholic products aboard.  The decree charges FTE with representing the interests of the Russian Federation in foreign courts concerning the recovery and protection of Russia's trademarks and with realizing the Russian Federation's right to register those trademarks aboard.  A true and correct copy of Decree No. 6 is attached as Exhibit P and is incorporated herein as though set forth at length.  Subsequent decrees, the newest of which remains in force, have continued to confirm FTE's authority.

141.    FGUP-SPI has assigned to FTE any remaining rights that it may have in the Marks as well as any claims relating to prior use of the Marks.

## FIRST CLAIM

### (Federal Trademark Infringement--15 U.S.C. § 1114(1))

### (Against All Defendants)

142.   Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 141, above, as though fully set forth herein.

143.   FTE is the rightful holder of the Marks because the Russian Federation has entrusted it with the Marks, making FTE the only entity in the world entitled to use and dispose of (but not assign) the Marks.  FTE has given Cristall the exclusive right to produce vodka bearing the Marks for sale in the United States.

144.   Defendants have used the Marks without permission or authorization by FTE, FGUP-SPI, VVO-SPI, or the Russian Federation.

145.   Defendants' unauthorized use of the Marks constituted and continues to constitute trademark infringement and was and is likely to cause:  (a) confusion, deception and mistake among the consuming public and trade; and (b) irreparable injury to FTE, including injury to its reputation and to the distinctive high quality of its trademarks.

146.   Defendants' wrongful conduct has caused, and unless enjoined as to the Shefler Defendants and the WGS Defendants will continue to cause, irreparable injury to Plaintiffs for which Plaintiffs have no adequate remedy at law.  Plaintiffs are therefore entitled to a preliminary and permanent injunction restraining and enjoining the Shefler Defendants and the WGS Defendants, their agents, servants, and employees and all persons acting thereunder, in concert with, or on their behalf, from using, licensing, assigning other than to FTE, or selling the Marks.

147.   Because Defendants' wrongful activities constituted and continue to constitute trademark infringement, and because Defendants' conduct was wanton, deliberate, malicious, and willful, Plaintiffs also are entitled to the remedies set forth in 15 U.S.C. §§ 1117(a) and 1118.  Specifically, Plaintiffs are entitled to recover all profits earned by the

Defendants, trebled; all damages Plaintiffs have sustained, trebled; as well as attorneys' fees, costs, and all other available remedies.

## SECOND CLAIM

**(Contributory Federal Trademark Infringement--15 U.S.C. § 1114(1))**

**(Against the Shefler Defendants)**

148.   Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 147, above, as though fully set forth herein.

149.   The Shefler Defendants are liable for contributory trademark infringement as the suppliers of infringing goods to the Allied Domecq Defendants and WGS Defendants. The Shefler Defendants have supplied, and continue to supply, infringing products to the ADIHBV Defendants and WGS Defendants even after they knew, or had reason to know, that the ADIHBV Defendants and WGS Defendants were infringing the Marks and that the Marks were owned by FTE and earlier by its predecessor FGUP-SPI.  The Shefler Defendants' knowledge was based on, among other things, the Russian court rulings determining the rights in, and ownership of, the Marks.

150.   The Shefler Defendants are also liable for contributory trademark infringement because they intentionally induced the ADIHBV Defendants and WGS Defendants to infringe the Marks.

151.   The Shefler Defendants' wrongful conduct has caused and, unless enjoined, will continue to cause, irreparable injury to Plaintiffs for which Plaintiffs have no adequate remedy at law.  Plaintiffs are therefore entitled to a preliminary and permanent injunction restraining and enjoining the Shefler Defendants, their agents, servants, and employees and all persons acting thereunder, in concert with, or on their behalf, from using, licensing, assigning other than to FTE, or selling the Marks.

152.   Plaintiffs are also entitled to the remedies set forth in 15 U.S.C. §§ 1117(a) and 1118. Specifically, Plaintiffs are entitled to recover all profits earned by Defendants, trebled;

34

all damages FTE has sustained, trebled; as well as attorney's fees, costs, and all other available remedies.

### THIRD CLAIM

### (Declaratory Relief–28 U.S.C. § 2201(a))

### (Against All Defendants By FTE)

153.   FTE repeats and realleges each and every allegation of paragraphs 1 through 152, above, as though fully set forth at length.

154.   An actual controversy exists between FTE and Defendants with respect to ownership of, and the right to use, the Marks.  FTE and the Shefler Defendants each contend they are the rightful holders of the Marks.  The Allied Domecq Defendants contended they were the rightful assignees from the Shefler Defendants of the Marks, but FTE denies that.  Similarly, the WGS Defendants each contend that they have the sole right to use and/or acquire security interests in the Marks, but FTE denies that.

155.   FTE seeks to have the registrations of the Marks corrected on the Federal Register of the United States Patent and Trademark Office so that FTE is the holder of the Marks.

156.   Spirits International is not the rightful registrant of the Marks for at least the following reasons: (1) VAO-SPI obtained operative control of the Marks as a result of fraud and wrongdoing of which Spirits International and the other Defendants were fully aware; (2) with the Shefler Defendants' knowledge, ADIHBV obtained the registrations of many of the Marks through fraud and wrongdoing; (3) the registrations of many of the Marks were obtained contrary to the requirements of 15 U.S.C. § 1052(a); and (4) Spirits International accepted the assignment of the Marks in 2008, while fully aware of a final Russian court decision adverse to its chain of title.

157.   Accordingly, FTE seeks a declaration that it was and is the true holder of the Marks.

## FOURTH CLAIM

### (Rectification of Register--15 U.S.C. § 1119)

### (Against All Defendants By FTE)

158.   FTE repeats and realleges each and every allegation of paragraphs 1 through 157, above, as though fully set forth herein.

159.   Spirits International is not the rightful registrant of the Marks for at least the following reasons: (1) VAO-SPI obtained operative control of the Marks as a result of fraud and wrongdoing of which Spirits International and the other Defendants were fully aware; (2) with the Shefler Defendants' knowledge, ADIHBV obtained the registrations of many of the Marks through fraud and wrongdoing; (3) the registrations of many of the Marks were obtained contrary to the requirements of 15 U.S.C. 1052(a); and (4) Spirits International accepted the assignment of the Marks in 2008, while fully aware of a final Russian court decision adverse to its chain of title.

160.   Accordingly, FTE seeks an order from the Court to the Director of the Patent and Trademark Office certifying that FTE is the true holder of the Marks and ordering a correction to the Federal Register to reflect FTE as the holder of said marks.

## FIFTH CLAIM

### (Cancellation of Marks--15 U.S.C. § 1119)

### (Against All Defendants By FTE)

161.   FTE repeats and realleges each and every allegation of paragraphs 1 through 160, above, as though fully set forth herein.

162.   FTE is the rightful owner of the Marks, which have acquired considerable value and have become well-known and famous to the consuming public and trade in the United States and throughout the world.

163.     The Shefler Defendants and the Allied Domecq Defendants have sought to and did register trademarks incorporating the Marks or derivatives thereof in the United States without the authorization or consent of FTE, FGUP-SPI, VVO-SPI, or the Russian Federation.

164.     The Shefler Defendants and the Allied Domecq Defendants knowingly and deliberately misrepresented to the Patent and Trademark Office that they were entitled to register trademarks incorporating the Marks, and such fraudulent misrepresentations materially affected the Patent and Trademark Office's decision to register those marks.

165.     The trademarks derived from the Marks that the Shefler Defendants and the Allied Domecq Defendants have used in interstate commerce are confusingly similar to the Marks, and were and are intended to confuse and deceive consumers.

166.     For that reason, FTE seeks cancellation of any STOLICHNAYA-related trademarks that Defendants have registered or that may become registered, including the following:

| Mark | Serial No. | Filing Date | Reg. No. | Reg. Date | Status as of present date |
|------|-----------|-------------|----------|-----------|---------------------------|
| STOLICHNAYA ELIT and design | 78/177458 | 10/23/02 | 3044248 | 01/17/06 | Registered |
| STOLICHNAYA ELIT | 78/153281 | 08/12/02 | 3325498 | 10/30/07 | Registered |
| STOLICHNAYA CRANBERI | 78/150258 | 08/02/02 | 2984881 | 08/16/05 | Registered |
| STOLI CRANBERI | 78/150200 | 08/02/02 | 2915969 | 01/04/05 | Registered |
| STOLICHNAYA CITROS | 78/150196 | 08/02/02 | 2936005 | 03/29/05 | Registered |
| STOLI OHRANJ and design | 78/597869 | 03/30/05 | 3076407 | 04/04/06 | Registered |
| STOLI OHRANJ and design | 78/602661 | 04/06/05 | 3076475 | 04/04/06 | Registered |
| STOLICHNAYA STOLI WILD CHERRI and design | 85/068226 | 06/22/10 | - | - | Pending |
| STOLICHNAYA STOLI WHITE POMEGRANIK and | 77/899772 | 12/23/09 | - | - | Published |

| Mark | Serial No. | Filing Date | Reg. No. | Reg. Date | Status as of present date |
|---|---|---|---|---|---|
| design | | | | | |
| STOLICHNAYA STOLI POMEGRANIK POMEGRANATE FLAVORED RUSSIAN VODKA SPI and design | 77/719236 | 04/22/09 | 3883661 | 11/30/10 | Registered |
| STOLICHNAYA STOLI STRASBERI and design | 75/188875 | 10/28/96 | 2552858 | 03/26/02 | Registered |
| STOLI RAZBERI | 75/129531 | 07/03/96 | 2175465 | 07/21/98 | Registered |
| STOLI VANIL | 75/129503 | 07/03/96 | 2192600 | 09/29/98 | Registered |
| STOLI STRASBERI (stylized) | 75/420404 | 01/20/98 | 2205863 | 11/24/98 | Registered |
| FROM THE HOUSE OF STOLICHNAYA | 85/031409 | 05/06/10 | - | - | Pending |
| STOLICHNAYA STOLICHNAYA and design | 79/085598 | 06/28/10 | - | - | Pending |
| STOLICHNAYA | 77/629086 | 12/09/08 | - | - | Pending |
| STOLICHNAYA VANIL | 75/914959 | 02/11/00 | 2857139 | 06/29/04 | Registered |
| STOLICHNAYA and design | 75/188870 | 10/28/96 | 2317475 | 02/15/00 | Registered |
| STOLICHNAYA STRASBERI | 75/408893 | 12/22/97 | 2202991 | 11/10/98 | Registered |
| STOLICHNAYA GOLD | 75/184282 | 10/21/96 | 2455605 | 05/29/01 | Registered |
| STOLICHNAYA OHRANJ | 74/494691 | 02/28/94 | 1988911 | 07/23/96 | Registered |
| STOLICHNAYA RUSSIAN VODKA and design | 74/288268 | 06/26/92 | 1852552 | 09/06/94 | Registered |
| STOLICHNAYA STOLI RAZBERI and design | 75/188876 | 10/28/96 | 2204355 | 11/17/98 | Registered |
| STOLICHNAYA STOLI VANIL and design | 75/852935 | 11/19/99 | 2898451 | 11/02/04 | Registered |
| STOLI BLAKBERI | 77/296216 | 10/04/07 | 3620153 | 05/12/09 | Registered |
| STOLI PEACHIK | 77/298233 | 10/08/07 | 3526585 | 11/04/08 | Registered |

| Mark | Serial No. | Filing Date | Reg. No. | Reg. Date | Status as of present date |
|------|-----------|-------------|----------|-----------|---------------------------|
| STOLI GALA APPLIK | 77/778148 | 07/10/09 | 3861810 | 10/12/10 | Registered |
| STOLI BLUEBERI | 78/707756 | 09/07/05 | 3110643 | 06/27/06 | Registered |
| STOLICHNAYA STOLI BLUEBERI BLUEBERRY FLAVORED RUSSIAN VODKA and design | 78/758074 | 11/21/05 | 3331722 | 11/06/07 | Registered |
| STOLICHNAYA STOLI CRANBERI CRANBERRY FLAVORED RUSSIAN VODKA and design | 78/758082 | 11/21/05 | 3236313 | 05/01/07 | Registered |
| STOLICHNAYA STOLI CRANBERI CRANBERRY FLAVORED RUSSIAN VODKA and design | 78/758089 | 11/21/05 | 323614 | 05/01/07 | Registered |
| STOLICHNAYA STOLI BLUEBERI BLUEBERRY FAVORED RUSSIAN VODKA | 78/712452 | 09/14/05 | 3341339 | 11/20/07 | Registered |
| STOLI BLUEBERI (stylized) | 78/710734 | 09/12/05 | 3110644 | 06/27/06 | Registered |

## SIXTH CLAIM

### (Misappropriation)

### (Against All Defendants)

167.    Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 166, above, as though fully set forth at length.

168.    By reason of the foregoing acts, Defendants have engaged in common law misappropriation. FTE (and its predecessors in interest and their licensee, PepsiCo) invested a substantial amount of time, effort and money to develop the Marks, which are now extremely valuable both in New York and the United States as a whole. As a result of FTE's labors, and the labors of its predecessors and licensees, consumers in New York and the United States have come to expect that STOLICHNAYA vodka comes from a single source in Russia other than the

39

Defendants. Defendants improperly obtained ownership and/or use of the Marks without authorization by FTE, FGUP-SPI, VVO-SPI, or the Russian Federation.

169. Pursuant to its agreement with FTE, plaintiff Cristall seeks to sell genuine Russian vodka under the Marks, which would compete with the vodka sold by the WGS Defendants.

170. Defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Plaintiffs for which Plaintiffs have no adequate remedy at law. Plaintiffs are therefore entitled to a preliminary and permanent injunction restraining and enjoining all Defendants (other than the Allied Domecq Defendants), their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, from using, licensing, assigning other than to FTE, or selling the Marks.

171. As a result of Defendants' actions, Plaintiffs have been and are being damaged, in an amount to be proved at trial. In addition to their actual damages, Plaintiffs seek and are entitled to an accounting of all profits enjoyed by Defendants as a result of their wrongful conduct.

172. Additionally, Defendants' actions were and are in bad faith, in conscious disregard of Plaintiffs' rights, and performed with the intention of depriving FTE of its intellectual property rights. Accordingly, Defendants' conduct merits, and Plaintiffs seek, an award of punitive and exemplary damages in an amount sufficient to punish Defendants and deter such conduct in the future.

## PRAYER FOR RELIEF

Wherefore, FTE and Cristall pray for judgment against Spirits International, SPI Spirits, SPI Group S.A., ADIHBV, AD USA, WGS USA, WGS Inc., Shefler, and Oliynik, and each of them, as follows:

A.      On the First and Second Claims for Relief, for preliminary and permanent injunctions prohibiting the Shefler Defendants from using, licensing, assigning other than to FTE, or selling the Marks.

B.      On the First and Second Claims for Relief, for an accounting of Defendants' unjust profits, trebled; damages, trebled; as well as costs, attorneys' and investigators' fees.

C.      On the Third and Fourth Claims for Relief, for a declaration that FTE is the rightful owner of the original STOLICHNAYA trademark in the United States and the rest of the Marks, and for an order directed to the United States Patent and Trademark Office to correct the Principal Register to accurately reflect that ownership.

D.      On the Fifth Claim for Relief, for cancellation of any trademarks that Defendants have registered or are in the process of registering that are derived from the Marks.

E.      On the Sixth Claim for Relief, for Plaintiffs' damages, costs, attorneys' and investigators' fees, punitive and exemplary damages in an amount sufficient to punish Defendants and deter others, and an accounting of the Defendants' unjust profits.

F.      On all Claims, for such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs Russian Federal Treasury Enterprise Sojuzplodoimport and OAO "Moscow Distillery Cristall" respectfully demand trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: New York, New York
       February 22, 2011

                                          QUINN EMANUEL URQUHART
                                          & SULLIVAN, LLP

                                          By: _____
                                              John B. Quinn
                                              Marc Greenwald
                                              Jonathan B. Oblak

                                          51 Madison Avenue, 22d Floor
                                          New York, New York 10010
                                          (212) 849-7000
                                          johnquinn@quinnemanuel.com
                                          marcgreenwald@quinnemanuel.com
                                          jonoblak@quinnemanuel.com

                                          Attorneys for Plaintiffs
                                          Federal Treasury Enterprise Sojuzplodoimport
                                          "FTE" and OAO "Moscow Distillery Cristall"

Of Counsel:

  Steven G. Madison
  David W. Quinto

QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000
stevemadison@quinnemanuel.com
davidquinto@quinnemanuel.com

  Daniel Bromberg

QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065-2139
(650) 801-5000
danbromberg@quinnemanuel.com